UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JULIET BAIRD ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:11-cv-00364-GZS |
| | ) | |
| FIRST WIND ENERGY LLC, *et als.*, | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION**

Juliet Baird Alexander, a resident of the Town of Rumford, commenced this civil action against First Wind Energy LLC, Central Maine Power Company ("CMP"), and the Rumford Board of Selectmen, requesting a preliminary injunction, money damages, and declaratory and injunctive relief. Alexander seeks to prevent grid-scale, industrial wind-energy development projects in Rumford or anywhere else within the surrounding mountain vistas of western Maine. Alexander requests an order that will enjoin First Wind from "interfering" with Rumford policy-making related to grid-scale, wind-energy development and from engaging in excavation and wind energy development activities on the ground. Alexander also seeks an order that will enjoin CMP from engaging in activities that would connect its transmission lines to any First Wind installation.

Each defendant has filed a motion to dismiss the action. (First Wind's Mot. to Dismiss, Doc. No. 18; CMP's Mot. to Dismiss, Doc. No. 21; Rumford Bd.'s Mot. to Dismiss, Doc. No. 30.) Alexander has filed a motion requesting leave to amend her complaint (Doc. No. 35). The Court referred these motions for report and recommended decision. I recommend that the Court

deny Alexander leave to amend, grant the defendants' motions, and dismiss Alexander's civil action with prejudice.

## The Pleadings

Following a series of jurisdictional averments, Alexander incorporates into her complaint (Doc. No. 1), by reference, a number of factual allegations found in her petition for writ of mandamus[1] (Doc. No. 1-1) and then recites two causes of action, or counts. Count I of the complaint is a plea for injunctive relief in which Alexander alleges that the Maine Wind Energy Act, 35-A M.R.S. §§ 3401-3404, and the related statutory provisions titled Expedited Permitting of Grid-Scale Wind Energy Development, 35-A M.R.S. §§ 3451-3458, are unconstitutional. According to Alexander, these two statutes result in a *de facto* taking of personal property without providing her any compensation or the public with any benefit, abridge her privileges and immunities, deny her equal protection, and deprive her of substantive and procedural due process. (Compl. ¶ 10.) Alexander requests that the Court declare the statutes "constitutionally defective and permanently enjoined." (Id., Prayer ¶ 1.)

Count II of the complaint alleges that the defendants have acted under color of state law to "implement their unconstitutional provisions" and deprive Alexander of her rights under the Fifth Amendment and Fourteenth Amendment, including by way of "malicious" trespass. (Id., ¶ 11.) For this, Alexander requests damages. (Id., Prayer ¶ 2.) Additionally, with respect to both counts, Alexander requests that the Court "permanently enjoin Defendants . . . from benefitting in any respect whatsoever from the provisions of the above transparently unconstitutional statutes and order [Defendants] to remove all industrial, grid-scale wind energy generating

---

[1] The Court has already denied Alexander's request for a writ of mandamus against the Rumford Board of Selectmen (Doc. No. 4), for a temporary restraining order (Doc. No. 5), and for the Court to consider her motion for preliminary injunction *ex parte* (Doc. No. 24). The Court denied these motions in its Order dated November 2, 2011. (Doc. No. 28.)

facilities erected as a result of said constitutionally defective provisions," as well as award her the costs of her action. (Id., Prayer ¶ 3.)

The allegations incorporated into the complaint from the petition for writ of mandamus tell the following tale, distilled to its essence. First Wind discussed with the Rumford Board of Selectmen ("the Board") the possibility of grid-scale, wind energy development in Rumford for several years prior to the passage of the challenged statutes. The Board twice developed proposed "wind ordinances" of its own, both of which failed to gain sufficient popular support in municipal elections. However, First Wind was also talking with representatives in Augusta and succeeded in getting legislative approval of, and the Governor's signature on, the aforementioned statutes. Alexander alleges that the Board's second attempt to pass a wind ordinance was a bogus affair because the Board and First Wind were aware that the new legislation would make any local wind ordinance "dead on arrival." (Id. ¶¶ 5-6.) On the other hand, Alexander also complains that the Board has persisted in its effort to pass a local wind ordinance, notwithstanding the passage of the statutes. (Id. ¶ 8.) Alexander also complains that the Board permitted CMP to erect certain transmission facilities in Rumford to connect with a wind energy project in neighboring Roxbury. (Id. ¶ 7.)

Alexander offers more than 100 additional allegations in her petition for writ of mandamus. These allegations primarily describe the statutes in question or present argument in support of the petition. Those allegations are not repeated here.

**The Proposed Pleading Amendments**

Alexander has filed a motion for leave to amend her pleadings. Alexander would like to name as additional defendants Attorney Thomas Carey, alleged to be Rumford's town counsel; Angus King, former Governor of the State of Maine, and two former members of the Rumford

3

Board of Selectmen, Mark Belanger and Frank DiConzo. She would like for her complaint to include these individuals for purposes of count II. (See Mot. to Add Named Defs. to Compl., Doc. No. 35.) The Rumford Board and CMP oppose the motion, arguing that the proposed amendments are futile because they would not overcome any of their case-dispositive arguments. (See CMP's Response in Opp'n, Doc. No. 41; Rumford Bd.'s Response in Opp'n, Doc. No. 42.)

**The Maine Wind Energy Act**

The Legislature adopted the Maine Wind Energy Act in 2004. The statute recites several findings, including a finding "it is in the public interest to encourage the construction and operation of community wind power generation facilities in the State." 35-A M.R.S. § 3402; *see also* P.L. 2003, ch. 665, § 3 (effective July 30, 2004); P.L. 2005, ch. 646, § 3 (Aug. 23, 2006); Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot., 2011 ME 39, ¶ 13, 15 A.3d 1263, 1268. The Legislature amended the Act in 2008, asserting that "it is in the public interest to reduce the potential for controversy regarding siting of grid-scale wind energy development by expediting development in places where it is most compatible with existing patterns of development and resource values when considered broadly at the landscape level." An Act to Implement Recommendations of the Governor's Task Force on Wind Power Development, P.L. 2007, ch. 661, § A-5 (effective April 18, 2008) (codified at 35-A M.R.S. § 3402(2)). These amendments also added chapter 34-A to Title 35-A. Chapter 34-A is entitled "Expedited Permitting of Grid Scale Wind Energy Development." Id. (codified at 35-A M.R.S. §§ 3451-3458). Along these lines, the amendment to the Wind Energy Act calls for modification of the regulatory permitting and siting process to "encourage the siting of wind energy developments in these areas." 35-A M.R.S. § 3402(2). Such modifications include, but are not limited to:

> A. Making wind energy development a permitted use within certain parts of the State's unorganized and deorganized areas;

4

> B. Refining certain procedures of the Department of Environmental Protection and the Maine Land Use Regulation Commission; and
>
> C. Because the Legislature recognizes that wind turbines are potentially a highly visible feature of the landscape that will have an impact on views, judging the effects of wind energy development on scenic character and existing uses related to scenic character based on whether the development significantly compromises views from a scenic resource of state or national significance such that the development has an unreasonable adverse effect on the scenic character or existing uses related to the scenic character of that resource.

Id.

With respect to the merits of a proposed wind energy project, the Act calls for a weighing of "beneficial environmental effects," "potential scenic impacts," wind-power-specific "adverse environmental effects," and "site-specific impacts on natural values, including, but not limited to, wildlife, wildlife habitats and other ecological values." Id. These are to be weighed in "state permitting decisions" made "pursuant to approval criteria tailored to address issues presented by wind energy development." Id. Additionally, the Legislature has found that development of wind energy resources "should be undertaken in a manner that ensures significant tangible benefits to the people of the State, including, but not limited to, residents of communities that host wind energy facilities." Id. The Act authorizes the Public Utilities Commission to take certain acts to support wind energy, id. § 3403, and establishes certain wind energy generation goals, Id. § 3404.

Chapter 34-A sets forth the legislative scheme for expedited permitting. Chapter 34-A defines the expedited permitting area to include "the organized areas of the State in their entirety," subject to certain tidal restrictions, and "the State's unorganized and deorganized areas" that are "identified by rule by the Maine Land Use Regulation Commission." 35-A M.R.S. § 3451(3). Chapter 34-A makes the Department of Environmental Protection (DEP) or

5

the Maine Land Use Regulation Commission (LURC) the primary siting authority for expediting permitting within their respective jurisdictions. 35-A M.R.S. § 3451(8). Chapter 34-A prescribes standards and criteria for determining the effect a wind energy development proposal will have on "scenic character" and "existing uses," factors that must be evaluated by the Department or by the Commission under their respective permitting rules. See 12 M.R.S. § 685-B(4) (LURC "development review and approval"; "criteria for approval"); 38 M.R.S. § 484(3) (DEP "standards for development"; "no adverse effect on the natural environment"). The siting authority must determine "whether the development significantly compromises views from a scenic resource of state or national significance such that the development has an unreasonable adverse effect on the scenic character or existing uses related to scenic character of the scenic resource of state or national significance." 35-A M.R.S. § 3452(1). To make this determination, the siting authority must use the evaluation criteria set forth in Chapter 34-A and, except for "certain associated facilities,"[2] need not consider whether the wind energy development "fits harmoniously in to the existing natural environment in terms of potential effects on scenic character and existing uses related to scenic character."[3] Id. § 3452(1)(2).

In addition to prescribing eight wind-energy-specific evaluation criteria, Chapter 34-A specifies that the "highly visible" nature of wind energy generating facilities is not itself a sufficient basis for finding an unreasonable adverse effect on scenic character and existing uses. Id. § 3452(3). Additionally, generating facilities located more than eight miles from a scenic resource of state or national significance are to be regarded as "insignificant," id., whereas generating facilities located more than three miles from the

---

[2] "Associated facilities" means facilities other than generating facilities, such as "buildings, access roads, generator lead lines and substations." 34-A M.R.S. § 3451(1).
[3] The "fits harmoniously" standard is otherwise applicable under LURC's development review and approval criteria, 12 M.R.S. § 685-B(4)(C), and DEP's standards for development, 38 M.R.S. § 484(3).

6

scenic resource are presumed not to require a visual impact assessment, which presumption may be rebutted by "any interested person within 30 days of acceptance of the developer's permit application" based on a showing of "substantial evidence that a visual impact assessment is needed." Id. § 3452(4).

The Legislature has delegated to the Department of Conservation the duty to "adopt rules to designate scenic viewpoints located on state public reserved land or on a trail that is used exclusively for pedestrian use, such as the Appalachian Trial." Id. § 3457(1). It has delegated to the Executive Department, State Planning Office, the duty to "adopt rule regarding the methodology for conducting a scenic inventory of scenic resources of state or national significance that are located in the coastal area." Id. § 3457(2).

## DISCUSSION

The defendants raise a collection of challenges to Alexander's civil action to vindicate alleged constitutional rights. Among these, the Rumford Board challenges Alexander's standing to sue (Rumford Bd.'s Mot. at 5-6, Doc. No. 30) and argues that it cannot be liable, in any event, because a municipal custom or policy is not the driving force behind the alleged deprivation of which Alexander complains. (Id. at 8-10.) First Wind argues that none of the allegations are appropriately leveled at it, because it is not a governmental actor (First Wind Mot. at 1, 6-9); that it enjoys first amendment freedoms to participate in the political process, whether that relates to local ordinances or to state legislative activity (id. at 1, 4-6); and that Alexander has merely presented the Court with a "hyperbolic reimagining of everyday municipal and legislative land use actions" (id. at 3). CMP echoes First Wind's arguments, maintaining that it is not a state actor, that it has no duty to educate the public about state law, and that it should not be

liable for "providing interconnection service to wind generation facilities" pursuant to state and federal laws and regulations. (CMP's Mot. at 5.) CMP also suggests that a more definite statement should be required if Alexander attempts to argue "that CMP did something else that might be actionable under the causes of action she asserts." (Id. at 5.) All of the defendants argue that due process norms are not implicated by Alexander's allegations and that there is no class-based discriminatory animus to support a civil rights conspiracy or equal protection claim. (Rumford Bd.'s Mot. at 10-11.)[4]

**A.      Standing to Sue**

In the first count of her action, Alexander challenges the constitutionality of the Maine Wind Energy Act. The Rumford Board says Alexander lacks the standing to do so. There is little to be gained from a protracted discussion of this particular argument. Alexander's second count arises under federal law. She cites both 42 U.S.C. § 1983 and 42 U.S.C. § 1985, and she clearly can employ those statutes to pursue claims, even if her allegations ultimately fail to state a claim. Because the second count essentially overlaps with the first—Alexander alleges that the Maine Wind Energy Act arises from a conspiracy to deprive her (and the public at large) of certain constitutional or federal rights—the core questions are not avoided, in any event, on standing grounds. Nevertheless, "a plaintiff must separately prove standing 'for each claim he seeks to press.'" Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 47 n.15 (1st Cir. 2011) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006)).

---

[4]     CMP also objects to Alexander's failure to join the State of Maine as a defendant or serve it with process (CMP's Mot. at 1, Doc. No. 21). Alexander named the State of Maine as a party-in-interest, not as a defendant. Alexander also served the State with notice of the action and the State elected to forego appearing in the case. (See Doc. Nos. 40, 49.)

"Article III of the Constitution limits the federal judicial power to 'Cases' or 'Controversies,' thereby entailing as an 'irreducible minimum' that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." United Food & Commercial Workers Union Local 751 v. Brown Grp., 517 U.S. 544, 551 (1996).

The Rumford Board says that Alexander has not articulated an injury in fact because she has not identified a concrete and particularized invasion of a right. (Rumford Bd.'s Mot. at 6-7.) At the core, Alexander's action is animated by a personal concern for the scenic quality of the western mountains in which she lives. She believes this scenic beauty is threatened by wind energy development. Closer to her home, Alexander essentially alleges that wind energy development in Rumford is a fait accompli and she has brought suit against those she regards as the essential agents of that development. Alexander's concern for the scenic beauty of the western mountains could in the right circumstances be a particularized interest and the complained of wind energy development is conduct that would result in harm to her interest in that regard. See, e.g., Ctr. for Biological Diversity v. Lueckel, 417 F.3d 532, 537 (6th Cir. 2005) (finding that injuries to group's enjoyment of aesthetic and recreational values are sufficiently particularized for standing purposes, but also finding an absence of standing because the defendant Forest Service's conduct was not causally connected to the injury alleged). But Alexander is not bringing her claim under a federal statute such as the Wild and Scenic Rivers Act, 16 U.S.C §§ 1271 *et. seq.*, where the Court might fairly conclude that the complained of injury falls within the "zone of interests" that a particular federal provision is meant to protect. See id. at 536.

There remain certain prudential and constitutional concerns that inform the standing analysis. These include: "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen v. Wright, 468 U.S. 737, 751 (1984). The only federal law invoked in this case is the United States Constitution, more narrowly the Fifth and Fourteenth Amendments, with the Fourteenth being the operative amendment insofar as state action is concerned. (See Pl.'s Response to Def. Rumford Bd.'s Mot. ¶ 2, Doc. No. 45.) Quite unlike the plaintiffs in cases arising as a result of specific statutes and related agency action, who themselves often stumble when it comes to standing, see, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), Alexander is attempting to vindicate an interest in scenic beauty as a purely constitutional right.[5] Simply stated, the professed individual right to prevent others from engaging in development that might spoil the scenic beauty of the western mountains does not fall within any established zone of interest I am able to identify emanating from the Takings Clause, Privileges and Immunities Clause, the Due Process Clause, or the Equal Protection Clause of the Fourteenth Amendment. Even framed as a challenge to a state statute that "re-zoned" Rumford and most of the State of Maine (see Pet. for Writ of Mandamus at 3, ¶ 2, Doc. No. 4), Alexander has not identified any actual or imminent threat to a property interest protected under state law or any constitutional provision that *requires* the state to protect her aesthetic interest. It is not a regulatory taking of Alexander's property for the State to enact a law to expedite the regulatory review process through which grid-scale wind energy and associated facilities appear in the Maine landscape. Every time a zoning ordinance is passed, there are

---

[5]  Alexander's Petition for Writ of Mandamus includes a reference to the Federal Highway Beautification Act, but she does not base her civil action on that statute, quite understandably. (Pet. for Writ of Mandamus ¶ 62, Doc. No. 4.)

winners and losers, and it requires far more than a negative impact on the view to effectuate a regulatory taking that must be compensated under the Constitution.[6]

Ultimately, Alexander's complaints about aesthetic injury in this case are more in the nature of generalized grievances appropriately addressed to the representative branches of government, not necessarily falling within the zone of interests protected by the constitutional provisions she invokes. The Court should dismiss count I on standing grounds. Alternatively, if the Court concludes that Alexander has standing to pursue a scenic-injury takings, due process, privileges and immunities, or equal protection claim over the regulation or development of land she does not own, Alexander nevertheless fails to state a viable claim for reasons related below in section B(2).

**B.      Failure to State a Claim under 42 U.S.C. §§ 1983, 1985, 1986**

Rule 12 of the Federal Rules of Civil Procedure provides that a complaint can be dismissed for, among other things, "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss, the court accepts as true the factual allegations of the complaint, draws all reasonable inferences in favor of the plaintiff that are supported by the factual allegations, and determines whether the complaint, so read, sets forth a claim for recovery that is "plausible on its face." Eldredge v. Town of Falmouth, 662 F.3d 100, 104 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)). "A claim is facially plausible if supported by 'factual content that allows the court to draw the

---

[6] Generally speaking, a regulatory imposition must force a property owner to suffer a permanent physical invasion of her property or deprive her of essentially all of the economic use or investment-backed expectations associated with her property. See Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 125-27 (1st Cir. 2009). What Alexander complains of lies outside of that zone of interest. It is not even clear that Alexander's taking claim would be considered "ripe." Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 193-195 (1985).

reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 129 S. Ct. at 1949).

Alexander's second count alleges that the defendants have individually and jointly engaged in conduct that has deprived Alexander of her constitutional rights. This alternative approach to pleading the case has no more merit than the first count. In addition to the reasons for dismissal that I have discussed below, CMP and First Wind observe that Alexander's attempt to impose liability on them for their participation in municipal ordinance-drafting and related elections or in legislative policy-development is inimical to their first amendment right to petition government. (First Wind's Mot. at 4-5; CMP's Mot. at 4.) I prefer to offer a recommendation along more mundane lines. The lead opinions in this Circuit, Davric Me. Corp. v. Rancourt, 216 F.3d 143, 147 (1st Cir. 2000), and George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir. 1970), both involved antitrust actions. Given the other deficiencies in Alexander's action, there is no need for the Court to weigh in on this first amendment defense.

### 1. *State-Actor Status under Section 1983*

Section 1983 enables a person to pursue a civil action to vindicate federal constitutional and federal statutory rights when he or she has suffered a deprivation of those rights at the hands of a state actor. 42 U.S.C. § 1983. "It is only in rare circumstances that private parties can be viewed as state actors." Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005). The plaintiff bears the burden of proving that a private entity was engaged in state action or acted under color of state law for purposes of section 1983. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155 (1978). The state action requirement has two components:

> First, the deprivation must be shown to have been caused by the exercise of some
> right or privilege created by the state, or by a rule of conduct imposed by the state,

or by a person for whom the state is responsible. Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

Alexis v. McDonald's Rest., 67 F.3d 341, 351 (1st Cir. 1995) (citation omitted).

Of the three named defendants, only the Rumford Board qualifies for state actor status. First Wind is clearly a private party and its participation in the political process was a private pursuit, even if the political process is a matter of public concern. First Wind was not cloaked with any state authority in this regard. Private entities are not reasonably to be regarded as state actors merely because they are successful in achieving legislative or municipal initiatives. CMP also falls outside of the state actor category in this particular context. Even though CMP is a public utility, that fact does not mean CMP is a state actor whenever it erects transmission facilities or connects a private facility to the grid, which is all the reason Alexander has given for including CMP in this action. See Jackson v. Met. Edison Co., 419 U.S. 345, 352-54 (1974); Spickler v. Lee, 63 Fed. Appx. 2, 2-3 (1st Cir. 2003) (unpublished opinion).

Alexander responds that her complaint sufficiently alleges a cause of action because she says the defendants engaged in "behind the scenes joint activity." (Pl.'s Response to CMP's Mot. ¶ 17.) When a private person jointly engages in a prohibited action with state officials, he or she may be acting under color of state law. Lugar v. Edmondson Oil Co., 457 U.S. 922, 941-42; Alberto San, Inc. v. Consejo De Titulares Del Condominio San Alberto, 522 F.3d 1, 4 (1st Cir. 2008); Alexis, 67 F.3d at 351. However, Alexander's conclusory invocation of joint action does not suffice to support a plausible inference of state actor status for First Wind or CMP where the only actual activity she complains of consists of private-party support and encouragement for legislative and municipal initiatives and the installation of energy-generating or energy-transmission facilities on property that is not in the plaintiff's control. Alexander fails

to state a proper section 1983 claim against First Wind or CMP because neither was or is a state actor insofar as Alexander's plaints are concerned.

### 2. *Constitutional Deprivations under Section 1983*

Other than providing a cause of action, section 1983 of the Civil Rights Act does not confer any substantive rights; the rights that are vindicated in the action have to arise under another federal statute or constitutional provision. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). Ordinarily, when a section 1983 claim is presented, the first step is "to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). In this case, Alexander speaks of the Takings Clause,[7] the Privileges and Immunities Clause, the Due Process Clause, and the Equal Protection Clause, but she does so in order to advance a professed right to maintain the scenic quality of Maine's western mountain vistas.

Simply stated, none of the identified clauses of the Constitution bestows upon individuals a constitutional right to bar another's development of property on aesthetic grounds. Governments might choose to do so by means of the political process, but there is no individual constitutional right to prevent others from engaging in activities that tend to spoil the view. These are classic federal, state, and local concerns that are more appropriately addressed in the political arena.

With respect to due process, a constitutional claim would require that Alexander identify a deprivation involving a state law property right, or a deprivation involving a fundamental right, or arbitrary and capricious state action that is shocking to the conscience. Alexander has not identified any State law that provides Maine property owners or residents with a scenic-view property right in the overall landscape, or with a scenic-view trespass claim, even assuming there

---

[7] The Takings Clause is found in the Fifth Amendment, but applies to the states through the Fourteenth Amendment. Fideicomiso de la Tierra del Cano Martin Pena v. Fortuno, 604 F.3d 7, 12 (1st Cir. 2010).

14

was some procedural impropriety that is not apparent from the pleadings. Nor is such an interest "deeply rooted in this Nation's history and tradition." Washington v. Glucksberg, 521 U.S. 702, 721 (1997). Finally, it cannot be said that the statutes in question or the conduct alleged of any of the defendants comes anywhere near to being so outrageous as to shock the conscience. Clark v. Boscher, 514 U.S. 107, 112-13 (1st Cir. 2008); Mongeau v. City of Marlborough, 492 F.3d 14, 17-19 (1st Cir. 2007). Because there is no constitutional right at stake in this litigation, the Court should grant the defendants' motions and dismiss the section 1983 claim in count II.

**C.     Failure to State a Claim under 42 U.S.C. §§ 1985, 1986**

Section 1985 of the Civil Rights Act expressly prohibits conspiracies to deprive others of equal protection or equal privileges and immunities under the law, and it does not matter whether the defendant is a state actor or a private person. 42 U.S.C. § 1985(3). Section 1985 requires that a plaintiff "allege the existence of a conspiracy intended to deprive an individual or class of persons of protected rights based on 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" Burns v. State Police Ass'n, 230 F.3d 8, 12 (1st Cir. 2000) (internal quotation marks and citation omitted). Section 1986 provides a civil action against every person with knowledge that a section 1985 civil rights conspiracy is about to be committed who, "having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed." 42 U.S.C. § 1986.

Alexander's section 1985 claim fails—as does her section 1986 claim, by extension—because she makes no factual allegations to show that the defendants harbored class-based discriminatory animus that was directed toward interfering with Alexander's protected civil

15

rights.  See Maymi v. P.R. Ports Auth., 515 F.3d 20, 30 (1st Cir. 2008) .[8]  The Court should grant the defendants' motions and dismiss the section 1985 and section 1986 claims in count II.

**D.     The Motion to Amend is Futile**

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a complaint should be freely given.  Foman v. Davis, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'").  However, there are certain instances when leave to amend need not be allowed, such as a situation where the amendment would be futile.  Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir. 1990) ("Where an amendment would be futile or would serve no legitimate purpose, the district court should not needlessly prolong matters.").

Alexander's motion to amend the complaint would add Mark Belanger, Thomas Carey, Frank DiConzo, and Angus King to the list of defendants for count II.  The Court should deny the motion as futile.  The addition of these individuals to the roster of defendants would not give rise to any plausible inference of liability and the claims at issue would lack merit against these defendants every bit as much as they do against the Rumford Board, CMP, and First Wind.

---

[8]     Alexander does allude to differential treatment for tribal lands under the Maine Wind Energy Act (Pet. for Writ of Mandamus ¶¶ 17-20), but it is obvious that tribal sovereignty is at play, not invidious discrimination. Alexander also alleges there is a statutory scheme that allows for disparate treatment between the coast and the western mountains.  It is perfectly plain from the Act that wind energy development is anticipated for both the coastal region and the western mountain region of Maine.  Moreover, there is no apparent reason to blame the Rumford Board, First Wind, or CMP for how the State ranks or classifies various scenic or other values in relation to wind energy development.

### E. The Motion for Preliminary Injunction

When presented with a motion for a preliminary injunction, the Court must consider four factors (1) whether the plaintiff is likely to succeed on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether the status quo imposes greater burdens on the plaintiff than the proposed injunctive relief would impose on the defendant; and (4) what impact injunctive relief would have on the public interest. Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007). The first factor is often the divining rod. "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). The Court should deny Alexander's motion for preliminary injunction because she has failed to demonstrate a likelihood of success on the merits.

### CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court DENY Alexander's motion for preliminary injunction (Doc. No. 2); DENY Alexander's motion to amend her pleadings (Doc. No. 35); GRANT each defendant's motion to dismiss (Doc. Nos. 18, 21, 30); TERMINATE without any further action CMP's Motion for More Definite Statement (Doc. No. 21); and DISMISS Alexander's civil action WITH PREJUDICE.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

February 28, 2012 /s/ Margaret J. Kravchuk
U.S. Magistrate Judge